**United States District Court**
For the Northern District of California

1

2

3                    IN THE UNITED STATES DISTRICT COURT

4

5                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

6                                              No. C 09-04668 CW
V.L., et al.,
7                                              ORDER GRANTING
          Plaintiffs,                          PLAINTIFFS' MOTION
8                                              FOR A PRELIMINARY
     v.                                        INJUNCTION
9

10  JOHN A. WAGNER, Director of the
    California Department of Social
11  Services; DAVID MAXWELL-JOLLY,
    Director of the California Department
12  of Health Care Services; CALIFORNIA
    DEPARTMENT OF HEALTH CARE SERVICES;
13  CALIFORNIA DEPARTMENT OF SOCIAL
    SERVICES,
14
          Defendants.
15  _____/

16
          Plaintiffs are disabled and elderly Californians who need in-
17
    home assistance with one or more of the activities of daily living,
18
    such as eating, bathing, toileting or taking medication, in order
19
    to live safely at home without risk of serious injury or harm.
20
    Plaintiffs seek to prevent the State from applying a change in the
21
    law to reduce or terminate these services to over 130,000 people
22
    who receive them from the state In-Home Supportive Services (IHSS)
23
    program, by changing the eligibility criteria of the program in a
24
    way that, the Court concludes, likely violates federal law.  This
25
    change would reduce or terminate services to recipients based on
26
    numerical rankings and a complicated mathematical formula devised
27
    years ago, which was not designed, and has never been used, to
28

**United States District Court**
For the Northern District of California

1   measure an individual's need for care.

2       Plaintiffs provide ample evidence that they and others like

3   them will be irreparably harmed if they lose their in-home help.

4   They will be unable to care for themselves, suffer injuries, and be

5   relegated to emergency rooms, hospitals, and other institutions.

6   Although the State counters that its budget crisis requires such

7   cuts, and the Court weighs this in the balance, the increase in

8   more expensive hospitalization and institutionalization of needy

9   disabled and elderly people will likely outweigh the short-term

10  savings.  And in any event, the human suffering that will be caused

11  by the change in the law justifies the Court's preliminary

12  injunction against the implementation of this change.

13                              BACKGROUND

14      Under the 1965 federal Medicaid Act, the federal government

15  financially assists participating states that provide medical

16  services to eligible beneficiaries.  California participates in

17  Medicaid through the Medi-Cal Program.  In 1973, California

18  established In-Home Supportive Services (IHSS) as part of its Medi-

19  Cal program to provide assistance with the tasks of daily living to

20  low-income elderly and disabled persons.  IHSS is funded with a

21  combination of state, county and federal Medicaid monies.  Id.

22  § 12306.  Over 360,000 IHSS caregivers serve over 440,000

23  individuals in California.  Sixty percent of IHSS recipients are

24  senior citizens.

25      Those who qualify for IHSS are persons "who are unable to

26  perform the services themselves and who cannot safely remain in

27  their homes or abodes of their own choosing unless these services

28  are provided."  Welf. & Inst. Code § 12300(a).  The California

**United States District Court**
For the Northern District of California

Department of Social Services (CDSS) Manual of Policies and Procedures (MPP) similarly directs that IHSS "provides assistance to those eligible aged, blind and disabled individuals who are unable to remain safely in their own homes without this assistance."  MPP § 30-700.1.[1]  The MPP also states that a particular service will not be authorized unless the social worker evaluating the individual "has determined that the recipient would not be able to remain safely in his/her own home without IHSS" and "performance of the service by the recipient would constitute such a threat to his/her health/safety that he/she would be unable to remain in his/her own home."  Id. § 30-761.13-14.

In 1988, fifteen years after the IHSS program was created, the State legislature passed a law requiring the CDSS to develop a uniform needs assessment tool "to assure that in-home supportive services are delivered in all counties in a uniform manner."  Cal. Welf. & Inst. Code § 12309(a).

The CDSS developed and implemented such a tool, calling it the Uniformity Assessment System.  The System defined ranks of one to five for social workers to use in use in rating elderly or disabled individuals' functional abilities in each of fourteen areas:[2] housework; laundry; shopping and errands; meal preparation and

---

[1]The Court takes judicial notice of Plaintiffs' Exhibits A through I to their request and the State Defendants' Exhibits A and B to their request.  These documents consist of publications by state officials and agencies which contain facts that are not subject to reasonable dispute in that they are capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned.

[2]It is not clear why, but these areas do not include many other tasks for which IHSS hours may be authorized, such as helping with self-administration of medications or transportation to doctors' appointments.

clean up; mobility inside the residence; bathing and grooming; dressing; bowel, bladder and menstrual; transfer from one position to another; eating; respiration; memory; orientation; and judgment. The ranks are defined as follows:

> Rank one.  A recipient's functioning shall be classified as rank one if his or her functioning is independent, and he or she is able to perform the function without human assistance, although the recipient may have difficulty in performing the function, but the completion of the function, with or without a device or mobility aid, poses no substantial risk to his or her safety.

> Rank two.  A recipient's functioning shall be classified as rank two if he or she is able to perform a function, but needs verbal assistance, such as reminding, guidance, or encouragement.

> Rank three.  A recipient's functioning shall be classified as rank three if he or she can perform the function with some human assistance, including, but not limited to, direct physical assistance from a provider.

> Rank four.  A recipient's functioning shall be classified as rank four if he or she can perform a function, but only with substantial human assistance.

> Rank five.  A recipient's functioning shall be classified as rank five if he or she cannot perform the function, with or without human assistance.

Id. § 12309(d).

Social workers annually re-assess each recipient's rank in the fourteen areas on an individualized basis.  MPP § 30-761.1.  These social workers are specifically trained to determine a recipient's level of functional ability.  Since 2005, the State has spent $10 million providing eight days of training to over 16,000 social workers who conduct IHSS assessments.

However, the ranks have never before been used to determine IHSS eligibility.  Rather, as noted above, social workers were required to find a person eligible for services if he or she "would not be able to remain safely in his/her own home without IHSS."

United States District Court
For the Northern District of California

1  Id.; see also Welf. & Inst. Code § 12300(a); MPP § 30-700.1.  By

2  definition, an individual given a rank of two through five in any

3  of the functions needs some IHSS assistance to remain safely in his

4  or her own home.

5      Rather, the purpose of the ranks was to help social workers

6  determine with uniformity the number of hours of a particular

7  service elderly and disabled individuals needed.  In the MPP, time

8  guidelines are provided for each rank for some tasks.

9      As another part of the Uniformity Assessment System, the State

10  created the Functional Index (FI) Score in 1988.  Each recipient is

11  given an overall Functional Index Score between 1.00 and 5.00,

12  which is calculated based on a weighted average of eleven of the

13  recipient's fourteen ranks of functional ability.[3]  The mental

14  tasks (i.e., memory, orientation and judgment) are not counted in

15  this calculation.  The State calculated the weights by using the

16  following method: first, the State computed the county-wide average

17  number of hours per week of IHHS provided for each task for the

18  people who received help with that task; second, all the county-

19  wide averages more than one standard deviation away from the mean

20  were removed from the computation; third, the county-wide averages

21  from each of the remaining counties were then averaged to get a

22  state-wide average of hours per week for each task; fourth, the

23  state-wide average of hours per week for each task were added

24  together to get a state-wide number representing the average IHSS

25  hours per week for all of the tasks; fifth, the state-wide average

26  for each task was divided by the state-wide average for all of the

27

28      [3]The parties refer to these numerical ranks of functioning as
"functional ranks."

tasks together.  The quotient was the weight used to calculate the FI Score.  In effect, then, tasks that take more time are weighted more heavily.

These weights were calculated in 1988 and have not been changed since.  The weights are as follows:

| Function | Weight |
|---|---|
| Housework | .038 |
| Laundry | .037 |
| Shopping and Errands | .040 |
| Meal Preparation and Clean Up | .222 |
| Mobility Inside | .079 |
| Bathing and Grooming | .095 |
| Dressing | .057 |
| Bowel, Bladder and Menstrual | .129 |
| Transfer | .094 |
| Eating | .127 |
| Respiration | .082 |

An individual's FI Score is calculated using these weights as follows: A one is subtracted from his or her rank for each function.  Each of those numbers is multiplied by the weight assigned to the respective functions.  (As noted above, the mental functioning ranks are not counted.)  These products are totaled and a one is added to the sum.  The result is the FI Score.  In a July 1, 1989 Report to the Legislature on IHSS Uniformity, the CDSS stated, "Admittedly, the description of the application of the formula is difficult to conceptualize."  Report to Legislature: IHSS Uniformity at 10.

In effect, then, a person who needs help with a greater number of different tasks, especially tasks usually that take more time perform, will have a higher score than a person who needs help with a smaller number of different tasks, irrespective of the severity of their need for the help.  Need for assistance with the mental functioning tasks of memory, orientation and judgment is not

considered in the Score.

FI Scores were intended to be used by social workers and county and state administrators "to compare the FI Scores and FI Hours of clients on their caseload."  All County Letter No. 88-118 at 5.  For example, if the hours of IHSS approved by a social worker "do not seem to correlate to the FI Score, the worker should be able to identify unique circumstances which account for the variance."  Id.  The FI Score was specifically not meant to be used as a tool to predict the number of hours an individual beneficiary needed.  Id. at 4.  More importantly, the FI Score was not created to be an eligibility criterion to determine whether an individual beneficiary needed services to live safely in his or her home.

In response to California's current budget crisis, the Legislature passed and on July 28, 2009, the Governor signed ABX4 4, which put numerical ranks and FI Scores to a new use. Specifically, ABX4 4 amended section 12309 and added section 12309.2 to the California Welfare and Institutions Code, to provide that IHSS recipients must have a numerical rank of at least four in a given category of domestic and related services (i.e. housework; laundry; shopping and errands; and meal preparation and clean up) to receive any services in that category, and must have an FI Score of at least 2.0 to receive any IHSS services at all.

ABX4 4 exempts individuals authorized to receive either protective supervision or paramedical services.[4]  These

---

[4]"Paramedical services include the administration of medications, puncturing the skin or inserting a medical device into a body orifice, activities requiring sterile procedures, or other activities requiring judgment based on training given by a licensed
(continued...)

7

1   beneficiaries will continue to receive all of their IHSS services

2   regardless of their FI Scores and numerical ranks for domestic and

3   related services.  Cal. Welf. & Inst. Code §§ 12309(e)(2) &

4   12309(a)(3).  Defendants claim that if recipients rank at five in

5   any one of the mental functioning categories they receive

6   protective supervision services and are exempt from the ABX4 4

7   requirements.[5]  However, Plaintiffs dispute this point because

8   protective supervision is available only if "a need exists for

9   twenty-four-hours-a-day of supervision in order for the recipient

10  to remain at home safely," MPP § 30-757.173, and it is not clear

11  that everyone with a five in one of these categories requires

12  twenty-four hour care.

13      The new eligibility standards under ABX4 4 were to go into

14  effect on November 1, 2009.  CDSS estimates that 97,000 disabled

15  and elderly individuals would lose domestic and related services

16  and 36,000 would lose all IHSS services.

17      CDSS planned to deliver Notices of Action to recipients whose

18  IHSS benefits would be reduced or eliminated by ABX4 4.  The

19  notices were not sent because the Court issued a temporary

20  restraining order.  Defendants have submitted to the Court the

21  notices they intended to send.  If a recipient's services would be

22  terminated altogether because his or her FI Score is less than 2.0,

23  the notice would state:

24      AS OF 11/01/2009, THE IN-HOME SUPPORTIVE SERVICES (IHSS)
        YOU HAVE BEEN GETTING WILL STOP.  HERE'S WHY: A CHANGE IN
25

26      [4](...continued)
    health care professional."  Cal. Welf. & Inst. Code § 12300.1.
27

28      [5]In the three mental tasks (i.e., memory, orientation and
    judgment), recipients can be given ranks of only one, two or five.

> THE LAW SET A SPECIFIC NEED LEVEL NECESSARY TO GET IHSS
> THAT IS DETERMINED BY FUNCTIONAL INDEX SCORE.  THE NEED
> FOR IHSS IS DETERMINED UTILIZING A UNIFORM NEEDS
> ASSESSMENT TOOL DESIGNED TO EVALUATE FUNCTIONING IN ADLS
> (ACTIVITIES OF DAILY LIVING) AND IADLS (INSTRUMENTAL
> ACTIVITIES OF DAILY LIVING) MPP 12309(C)(1).  THE UNIFORM
> ASSESSMENT TOOL EVALUATES FUNCTIONAL ABILITY ON A DEFINED
> SCALE MADE UP OF 5 RANKS: 1 -- INDEPENDENT; 2 -- REQUIRES
> VERBAL ASSISTANCE; 3 -- REQUIRES SOME HUMAN ASSISTANCE;
> 4 -- REQUIRES SUBSTANTIAL HUMAN ASSISTANCE AND
> 5 -- CANNOT PERFORM WITH OR WITHOUT HUMAN ASSISTANCE.
> RANKING IS DONE IN 11 AREAS OF PHYSICAL FUNCTIONING.
> THEN A FUNCTIONAL INDEX (FI) SCORE IS DETERMINED
> UTILIZING A WEIGHTED AVERAGE CALCULATION APPLIED TO THE
> RANKINGS IN THESE 11 AREAS.  THE FUNCTIONAL INDEX SCORE
> PROVIDES A MEASUREMENT OF RELATIVE DEPENDENCE ON HUMAN
> ASSISTANCE FOR IHSS TASKS.  INDIVIDUALS WITH A FUNCTIONAL
> INDEX SCORE BELOW 2.0 ARE NOT ELIGIBLE TO RECEIVE IHSS
> (W&IC 12309(F)(2)).

Carroll Decl., Exh. C.  The notice then lists the recipient's

Functional Index Score as well as his or her ranks in each of the

eleven functions.  A cursory and opaque one-page description of how

the State calculates the Score would be enclosed.

   If some of a recipient's services would be terminated because

his or her rank in those functions is below four, the notice would

state:

> AS OF 11/01/2009, THE HOURS OF SERVICE FOR DOMESTIC YOU HAVE
> BEEN GETTING WILL STOP.  HERE'S WHY: A CHANGE IN THE LAW SET A
> SPECIFIC NEED LEVEL NECESSARY TO GET DOMESTIC OR RELATED
> SERVICES THAT IS DETERMINED BY FUNCTIONAL ABILITY IN THAT
> AREA.  FUNCTIONAL ABILITY IS MEASURED ON A 5 RANK SCALE: 1 --
> INDEPENDENT; 2 -- REQUIRES VERBAL ASSISTANCE; 3 -- REQUIRES
> SOME HUMAN ASSISTANCE; 4 -- REQUIRES SUBSTANTIAL HUMAN
> ASSISTANCE AND 5 -- CANNOT PERFORM WITH OR WITHOUT HUMAN
> ASSISTANCE.  INDIVIDUALS WITH A RANK BELOW 4.0 ARE NOT
> ELIGIBLE TO GET THE ASSOCIATED DOMESTIC OR RELATED SERVICE
> (W&IC 12309(E)(1)).  YOUR FUNCTIONAL RANK FOR DOMESTIC IS [1,
> 2 OR 3].  THEREFORE, YOUR NEED DOES NOT MEET THE REQUIRED
> LEVEL TO GET HELP WITH DOMESTIC SERVICES.

   The notice would then repeat the same paragraph for each

additional service eliminated.

   At the bottom of the page, both forms of notice state in

Spanish, "If you do not understand the information or notice,

1   contact the social worker in your county.  The county should

2   provide you with an interpretation service free of charge."

3      The back of both forms of notice advises recipients that they

4   have a right to a "conference with representatives of CDSS to talk

5   about this intended action."  Recipients also have the right to

6   receive a state hearing if they request it within ninety days of

7   the mailing date of the notice.  If the request is made "before the

8   effective date of the county's proposed action . . . services may

9   continue until the hearing."  If a recipient looks back to the

10  first page of the notice, he or she will learn that the date

11  alluded to is November 1, 2009.

12     On October 5, 2009, Plaintiffs filed this complaint and motion

13  for a temporary restraining order and/or preliminary injunction.[6]

14  Plaintiffs claim that amended sections 12309(e) and 12309.2 of the

15  California Welfare and Institutions Code violate the Medicaid Act,

16  the Americans with Disabilities Act, Section 504 of the

17  Rehabilitation Act and the Due Process Clause of the United States

18  Constitution.  The Court granted Plaintiffs' request to expedite

19  the briefing and set a hearing on the motion for October 19, 2009

20  based on Plaintiffs' understanding that the notices would be mailed

21  on October 20.  Defendants did not disabuse the Court of this

22

23         [6]Plaintiffs concurrently filed a motion for class
    certification.  However, Defendants concede that "there is no need
24  for the Court to consider class certification at this time."
    Opposition at 31.  "District courts are empowered to grant
25  preliminary injunctions 'regardless of whether the class has been
    certified.'"  Brantley v. Maxwell-Jolly, 2009 WL 2941519, at *14
26  n.14 (N.D. Cal.) (citing Schwarzer, Tashima and Wagstaffe, Federal
    Civil Procedure Before Trial, § 10:773 at 10-116 (TRG 2008)).
27  Thus, Plaintiffs can obtain class-wide injunctive relief before
    moving to certify a class and the Court denies Plaintiffs' motion
28  without prejudice to refiling at a later date.

United States District Court

For the Northern District of California

understanding.

On October 14, Deputy Attorney General Gregory Brown notified Plaintiffs that it was his "understanding that the Notices of Action will be going out to recipients on October 15, 2009." Surprised at State Defendants' decision to move forward with the Notices of Action earlier than expected despite the pending motion, Plaintiffs promptly moved for an immediate temporary restraining order to enjoin State Defendants from issuing Notices of Action to IHSS recipients regarding the subject matter of this litigation any time prior to this Court's ruling on the preliminary injunction motion.  The Court granted the temporary restraining order.[7]

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., ___ U.S. ___, 129 S. Ct. 365, 374 (2008).  "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"  Id. at 376 (quoting Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 542 (1987)).

## DISCUSSION

I.   Likelihood of Success on the Merits

    A.   Medicaid Act Claims

    As mentioned above, Congress established the Medicaid program

---

[7]The Court has considered and hereby denies Defendants' request for reconsideration of the temporary restraining order.

United States District Court
For the Northern District of California

in 1965 to enable states to provide medical services to individuals with limited abilities to pay for health care.  42 U.S.C. § 1396-1396v.  A state's participation in Medicaid is voluntary, but when a state chooses to participate, it must comply with the Medicaid Act and its implementing regulations.  42 U.S.C. § 1396.

    1.   Comparability Requirement

The "comparability" requirement of the Medicaid Act mandates comparable services for individuals with comparable needs and is violated when some recipients are treated differently than others where each has the same level of need.  42 U.S.C. § 1396a(a)(10)(B); see also 42 C.F.R. § 440.240; Jenkins v. Washington State Dep't of Social & Health Servs., 157 P.3d 388, 392 (Wash. 2007); Sobky v. Smoley, 855 F. Supp. 1123, 1139 (E.D. Cal. 1994) (comparability requirement "creates an equality principle" for all medically needy individuals); Schott v. Olszewski, 401 F.3d 682, 688-89 (6th Cir. 2005); White v. Beal, 555 F.2d 1146, 1151-52 (3d Cir. 1977).  The state may "place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures."  42 C.F.R. § 440.230(c)(2).  However, the state may not "arbitrarily deny or reduce the amount, duration, or scope of a required service . . . to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition."  42 C.F.R. § 440.230(c)(1).

The use of numerical ranks and FI Scores to determine eligibility for IHSS services likely violates the comparability requirement because neither reasonably measures the individual need of a disabled or elderly person for a particular service.

Numerical ranks are particularly inaccurate measures of the

12

**United States District Court**
For the Northern District of California

needs of individuals with mental impairments, such as elders with Alzheimer's disease.  Individuals with cognitive and psychiatric disabilities frequently require verbal rather than physical assistance.  Therefore, many of these individuals receive numerical ranks of two rather than three or four.  Numerical ranks of two for recipients with mental disabilities reflect the nature of the assistance needed, not the severity of the need.  Disabled and elderly individuals with numerical ranks of two have no less need for verbal assistance than individuals with severe physical impairments have for physical assistance.  For example, elders may need reminders to eat on a regular basis, take medication or avoid eating foods contraindicated with certain medications.  As one IHSS Program manager explains:

> Often all that someone with a cognitive or psychiatric disability needs in order to maintain a safe and independent living situation is someone who can come by every morning to encourage or remind them to get out of bed, bathe, get dressed, take medication, and have breakfast. . . . [W]ith no IHSS provider visiting regularly . . . [a] person's environment and ability to live safely in the community can fall apart in a matter of days, potentially leading to an exacerbated medical condition, hospitalization, institutionalization, homelessness and/or death.

Nicco Decl. ¶ 23.

A 1996 Study by the Institute for Social Research at California State University Sacramento to assess the FI Score as a predictor of IHSS hours noted that "whether provider assistance is verbal (rank 2) or physical (3) their presence during task performance is necessary and therefore the practical distinction between the two ranks is elusive."  Kline Decl., Exh. D at 14.[8]  As

---

[8]Each side has challenged the admissibility of the evidence
(continued...)

**United States District Court**
For the Northern District of California

noted above, all ranks, two through five, reflect a social worker's determination that IHSS recipients are "unable to perform the services themselves" and "cannot safely remain in their homes or abodes of their own choosing unless these services are provided." Welf. & Inst. Code § 12300(a).

Similarly, the Functional Index Score is not an accurate measure of need.  It does not weigh the critical nature of the services recipients need and it systematically disadvantages certain groups of recipients.  If a person with a particular type of disability does not need assistance with most activities, but critically needs substantial assistance with a few, he or she will likely receive a low FI Score, and will be deprived of <u>all</u> IHSS services.

For instance, recipients with seizure disorders generally have an FI Score below 2.0 because they only need assistance with bathing and cooking; however, it would be dangerous for these individuals to perform these activities themselves.  Blind recipients also generally have FI Scores below 2.0, but they critically need assistance traveling to medical appointments.

---

[8](...continued)
submitted by the other side.  However, on a motion for a preliminary injunction, the Court may consider inadmissible evidence, giving such evidence appropriate weight depending on the competence, personal knowledge, and credibility of the declarants. 11A Charles A. Wright, Arthur K. Miller & Mary K. Kane, <u>Federal Practice and Procedure</u> § 2949 at 216-217 (2d ed. 1995); <u>see also</u> <u>Flynt Distrib. Co. v. Harvey</u>, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial.  The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm.")  Therefore, the Court will exercise its discretion to consider the proffered evidence as appropriate.

United States District Court
For the Northern District of California

Nor does the length of time a task normally takes necessarily equate with the importance of the task to an individual's health and safety.  But an elderly person who needs help with tasks which on average are less time-consuming, such as mobility inside the home, transfer from sitting to standing or respiration, is more likely to receive a lower FI Score and lose all her services, than is one who needs help with the kinds of tasks that tend to take more time, such as meal preparation.

In sum, the FI Scoring system favors elderly and disabled people with many different needs, especially needs for help with tasks that are particularly time-intensive, over those with fewer different needs, and needs for help with tasks that are less time-intensive, even though the unmet needs of some of the latter recipients may be equally or more life-threatening than those of the former.  The FI Score simply does not measure the severity of need.

The FI Score is particularly inaccurate as a measure of the needs of children and adolescents, whose services will be terminated at disproportionately high rates.  Collins Decl. ¶ 7 (thirty-six percent of children in San Luis Obispo County will be terminated compared to twenty-five percent of adults); Nicco Decl. ¶¶ 8-9 (twenty-three percent of children in San Francisco County will be terminated compared to eight percent of adults).

Because children, with or without disabilities, are not generally expected to perform such tasks as meal preparation and housecleaning, children with disabilities are automatically ranked at one on such tasks.  This rank reflects, not the severity of their disabilities, but only the expectations of their age group.

To illustrate, a child or adolescent with a disability may have high numerical ranks in other tasks because of serious unmet needs such as mobility inside the home, transfer from one position to another, bathing, dressing, or toileting and menstruation. Nonetheless, his or her composite FI Score will be disproportionately lower than that of an adult with the same disability because the adult will likely have more tasks rated above a one.  Children's and adolescents' critical needs, though fewer in number, will not be met, merely because they do not have as many unmet needs as adults with the same level of disability.

FI Scores, like the numerical ranks, are also particularly inaccurate measures for individuals with mental impairments.  As noted above, FI Scores do not count the numerical ranks assigned by social workers for memory, judgment and orientation.  Therefore, mentally disabled individuals will generally have lower FI Scores than those with physical disabilities.  Individuals with mental disabilities may need only a few critical services, such as medication management and assistance with domestic and related tasks.  But, because they do not need help with a larger number of personal care functions such as bowel/bladder, ambulation or respiration, their FI Scores will generally be below 2.0.  Nicco Decl. ¶ 26; Syropiatko Decl. ¶ 6; Guerra Decl. ¶ 12; Baran Decl. ¶ 14; Oster Decl. ¶ 11.  Nevertheless, individuals with mental impairments are no less in need of IHSS services than those with physical impairments.

Jenkins, a recent opinion from the Washington State Supreme Court, is instructive.  In that case, the State had previously determined the number of hours of home health care services needed

16

by recipients, based on assessment of their ability to perform daily living activities.  The State then adopted a "shared living rule" which reduced the level of household services to recipients who lived with someone else.  The reduction was not based on an individual's needs for service, that is, it did not consider whether a recipient lived with someone who actually would help. The court held that the State violated the comparability requirement because it "reduce[d] a recipient's benefits based on a consideration other than the recipient's actual need."  Jenkins, 157 P.3d at 390.

Here, IHSS recipients have been assessed in an individualized process to determine the services they need to remain safely in their homes.  With the passage of ABX4 4, the State has mechanically applied the numerical ranks and FI Score to a use for which they were not designed.  The Score is not a meaningful measure of an individual's degree of need for services.  Because need is the only basis upon which distinctions between recipients can be made without violating the comparability requirement, Plaintiffs have made a strong showing of likelihood of success on the merits that ABX4 4 violates the comparability requirement of the Medicaid Act.

    2.   Reasonable Standards Requirement

The Medicaid Act requires that all participating states use "reasonable standards (which shall be comparable for all groups) . . . for determining eligibility for and the extent of medical assistance under the plan which . . . are consistent with the objectives" of the program.  42 U.S.C. § 1396a(a)(17).  The primary objectives of the Medicaid program are to provide medical

17

United States District Court
For the Northern District of California

assistance to individuals whose income and resources are insufficient to meet the costs of necessary medical services and to furnish "rehabilitation and other services to help such . . . individuals attain and retain capability for independence or self care."   42 U.S.C. § 1396-1.

For the reasons discussed above, numerical ranks and FI Scores were not designed as a measure of eligibility or need for IHSS services and cannot reasonably be used for this purpose.  In a manual produced by CDSS to help train social workers across the state about IHSS, the agency described the FI Score in response to the question, "How does the state compute the Functional Index," as follows: "that score has been tested and is not meaningful, so it is a moot point."  Kline Decl., Ex. E at 8.  A numerical rank of two or above for any particular task indicates that the recipient cannot live safely in his or her home without assistance for that task; however, under ABX4 4, domestic and related services will be terminated for all recipients with numerical ranks below four.

Plaintiffs have shown a likelihood of success on the merits of their claim that the law employs an unreasonable standard to determine the extent of medical assistance, in violation of § 1396a(a)(17).

Defendants also argue that Plaintiffs' claims under the reasonable standards requirement must fail because these provisions are not privately enforceable using 42 U.S.C. § 1983.  Defendants rely on Watson v. Weeks, 436 F.3d 1152 (9th Cir. 2006).  In that case, the Ninth Circuit held that Congress did not intend the reasonable standards requirement of Section 1396a(a)(17) to create a private right of action for individuals and organizations under

**United States District Court**
For the Northern District of California

§ 1983.  However, <u>Watson</u> does not bar a request for injunctive relief under the Supremacy Clause for violations of the Medicaid Act.  <u>Independent Living Ctr. S. Cal. v. Shewry</u>, 543 F.3d 1050, 1056-57 (9th Cir. 2009), <u>cert. denied</u>, 129 S. Ct. 2828 (2009).  In <u>Independent Living</u>, the Ninth Circuit noted, "The Supreme Court has repeatedly entertained claims for injunctive relief based on federal preemption, without requiring that the standards for bringing suit under § 1983 be met . . . ."  <u>Id.</u> at 1055.  The court continued that "a plaintiff seeking injunctive relief under the Supremacy Clause on the basis of federal preemption need not assert a federally created 'right,' in the sense that term has been recently used in suits brought under § 1983."  <u>Id.</u> at 1058. Although <u>Independent Living</u> involved a different provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(30)(A), nothing about the facts or the court's analysis in that case indicates that its holding would not apply to the statute at issue in the present case.  <u>See</u> <u>Lankford v. Sherman</u>, 451 F.3d 496, 509-13 (8th Cir. 2006). Although Section 1396a(a)(17) is not enforceable under § 1983, Plaintiffs' claims for injunctive relief may be brought under the Supremacy Clause.

> 3.   Sufficiency Requirement

The regulations implementing the Medicaid Act contain a "sufficiency" requirement, which mandates, "Each service must be sufficient in amount, duration, and scope to reasonably achieve its purpose."  42 C.F.R. § 440.230(b).  When a state commits to provide a Medicaid service, the sufficiency requirement ensures that it adequately fulfills that obligation.

Defendants argue that ABX4 4 satisfies the sufficiency

19

United States District Court
For the Northern District of California

requirement because the law "will ensure that individuals with a moderate to high level of need will continue to receive all necessary services."  Opposition at 22.  However, Defendants fail to explain how the purposes of the program -- to enable disabled and elderly people to remain in their homes safely -- will still be fulfilled if domestic and related services for 97,000 needy recipients are eliminated.

A 2009 report by the UCLA Center for Health Policy Research assessing the cuts to IHSS found that "domestic services are in some respects the 'glue' that permits older people to stay in their homes.  Shopping and meal preparation are especially essential, since they influence how much and how well older people eat." Benjamin Decl., Ex. B at 13.  "Weight loss in elders is often the reason that they end up being placed into nursing homes.  These domestic and related services are vital."  Id. at ¶ 30.

The services currently provided through IHSS have already been determined by social workers to be "necessary" to permit elderly and disabled individuals to remain safely in their homes.  MPP § 30-761.1.  Thus, the elimination of these services will likely leave affected individuals without a level of service sufficient to achieve the purpose of the program.  Accordingly, the Court concludes that Plaintiffs are likely to succeed on their sufficiency claim.[9]

---

[9]Defendants assert that Plaintiffs' "sufficiency" claim under 42 C.F.R. § 440.230(b) fails because a federal regulation, by itself, does not create a privately enforceable right.  See Alexander v. Sandoval, 532 U.S. 275, 286-87, 291 (2001).  However, federal regulations may carry preemptive force, see, e.g., Geier v. American Honda Motor Co., 529 U.S. 861, 884-86 (2000), and, as
(continued...)

**United States District Court**
For the Northern District of California

B.   Americans with Disabilities Act Claim

The Americans with Disabilities Act (ADA) and the Rehabilitation Act prohibit discrimination based on disability.  42 U.S.C. § 12132; 29 U.S.C. § 794(a).  Unnecessary isolation is a form of discrimination against people with disabilities.  As the Supreme Court has explained, "[u]njustified isolation of the disabled" amounts to discrimination because institutional placement "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and "severely diminishes everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 597, 60-61 (1999).

Thus, both the ADA and the Rehabilitation Act contain an "integration mandate" which "serves one of the principal purposes of Title II of the ADA: ending the isolation and segregation of disabled persons."  Arc of Washington State v. Braddock, 427 F.3d 615, 618 (9th Cir. 2005).  States are required to provide care in integrated environments for as many disabled persons as is reasonably feasible, so long as such an environment is appropriate to their health needs.  Specifically, the ADA regulations provide: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified persons with disabilities."  28 C.F.R. § 35.130(d).

"The 'most integrated setting' is defined as 'a setting that

_____

[9](...continued)
such, they may provide a cause of action for injunctive relief under the Supremacy Clause.

21

United States District Court
For the Northern District of California

enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible.'" Brantley, 2009 WL 2941519, at *6 (citing 28 C.F.R. pt. 35 app. A; Olmstead, 527 U.S. at 592).

Plaintiffs allege that ABX4 4 violates the "integration mandate" of the ADA and the Rehabilitation Act by placing people in serious risk of being forced to move out of their homes to the less integrated setting of institutions. Although Olmstead addressed ongoing institutionalization, plaintiffs who currently reside in community settings may assert ADA integration claims to challenge state actions that give rise to a risk of unnecessary institutionalization. See Fisher v. Oklahoma Health Care Auth., 335 F.3d 1175, 1181-82 (10th Cir. 2003) (imposition of cap on prescription medications placed participants in community-based program at high risk for premature entry into nursing homes in violation of ADA); Ball v. Rogers, 2009 WL 1395423, at *5 (D. Ariz.) (failure to provide them with needed services "threatened Plaintiffs with institutionalization, prevented them from leaving institutions, and in some instances forced them into institutions in order to receive their necessary care" in violation of the ADA and Rehabilitation Act); Mental Disability Law Clinic v. Hogan, 2008 WL 4104460, at *15 (E.D.N.Y.) ("even the risk of unjustified segregation may be sufficient under Olmstead").

Plaintiffs have submitted substantial evidence from experts, county officials, caregivers and individual recipients showing that class members face a severe risk of institutionalization as a result of losing the services that ABX4 4 would eliminate. For instance, individuals with mental disabilities who lose IHSS

**United States District Court**
For the Northern District of California

assistance to remind them to take medication, attend medical appointments and perform tasks essential to their continued health are at a severely increased risk for institutionalization. Elderly and disabled individuals with unmet in-home care needs will likely suffer falls which will lead to hospitalization and subsequent institutionalization. Elderly individuals who lose meal preparation services will decline in health and risk being placed in a nursing home.

Defendants claim that Plaintiffs are not at risk of institutionalization because some may have family members who may be able to take over the care once provided by IHSS and some might find care through some other community-based service. However, Defendants bear the ultimate responsibility for ensuring the State's compliance with federal disability law. "Thus, to the extent that Defendants are claiming that alternative services satisfy their obligations under the integration mandate, Defendants certainly bear the burden of ensuring more than a 'theoretical' availability of such services." Brantley, 2009 WL 2941519, at *10. Moreover, the record demonstrates that alternative services are not available for a large portion of the class members who face the risk of institutionalization. Accordingly, the Court concludes that Plaintiffs have shown a likelihood of success on the merits of their claim that Defendants violated the integration mandate.

C.    Due Process Claim

Due process requires that the state must provide "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Central

23

Hannover Bank & Trust Co., 339 U.S. 306, 314 (1950).  IHSS
recipients must receive "timely and adequate notice detailing the
reasons for termination and an effective opportunity to defend"
themselves.  Goldberg v. Kelly, 397 U.S. 254, 268-69 (1970).  To
comport with due process, notice must be "tailored to the
capacities and circumstances" of the recipients who must decide
whether to request a hearing.  Id. at 268.  "The government must
consider unique information about an intended recipient regardless
of whether a statutory scheme is reasonably calculated to provide
notice in the ordinary case."  Jones v. Flowers, 547 U.S. 220, 221
(2006).

Here, the notices Defendants plan to mail to IHSS recipients
likely do not comport with due process.  Many class members,
because of their disabilities or inability to read English or both,
will be unable to understand and act upon the notice within ten
days of receipt so that they can request a fair hearing and
continue to receive IHSS services.  For instance, fifteen percent
of IHSS recipients speak only Spanish.  There is one line at the
bottom of the notices in Spanish that tells recipients to contact
"the social worker in your county" if they do not understand the
information.  This phrase is misleading and confusing.  The notice
says that the county should provide free translation services but
it does not tell recipients how to get this service nor has the
State made a showing that each county actually will provide this
service.  Further, the notice does not warn Spanish-speaking
recipients that this is an important notice regarding termination
or reduction of benefits.  Thirty-four percent of recipients are
monolingual in a language other than English or Spanish.  Thus,

**United States District Court**
For the Northern District of California

1   this notice will be entirely meaningless to them.  It is not

2   reasonable to expect these individuals to obtain translation of the

3   notice in sufficient time to act upon it within ten days, to

4   receive aid pending termination.

5        The notice is also difficult to read.  The print is small,

6   single spaced and in all capital letters.  It contains unexplained

7   acronyms and the description of numerical ranks and FI Scores is

8   virtually unintelligible.  The elderly and disabled individuals

9   reading these notices will have a difficult time understanding

10  them, let alone taking the affirmative action required.  Many IHSS

11  recipients cannot easily leave their homes due to their

12  disabilities; the notice does not inform them of their right to

13  have a hearing at home to dispute the service cuts.

14       CDSS has recognized that, before this notice, IHSS "recipients

15  have not previously been informed of their FI Ranks or FI

16  Scores. . . . the NOA [Notice of Action] implementing this change

17  in law will be the first time recipients have been informed of

18  their FI Ranks or FI Scores."  All County Letter No. 09-56, sent on

19  October 1, 2009.  The terse notice and one page description of how

20  the FI Score is calculated do little to inform recipients of the

21  reasons for termination or how they might be able to rebut the

22  decision to terminate their IHSS services.  Therefore, the Court

23  concludes that Plaintiffs have shown a likelihood of success on the

24  merits of their claim that the notice violates due process.[10]

25  ───────────────

26       [10]Because the Court concludes that a preliminary injunction is
    warranted based on Plaintiffs' likelihood of success on their
27  Medicaid Act, ADA integration mandate and due process claims, the
    Court need not determine the likelihood of Plaintiffs' success on
28                                                       (continued...)

**United States District Court**
For the Northern District of California

II.   Irreparable Harm, Balance of Hardships and the Public Interest

Numerous federal courts have recognized that the reduction or elimination of public medical benefits irreparably harms the participants in the programs being cut.  See Beltran v. Myers, 677 F.2d 1317, 1322 (9th Cir. 1982) (holding that possibility that plaintiffs would be denied Medicaid benefits sufficient to establish irreparable harm); Newton-Nations v. Rogers, 316 F. Supp. 2d 883, 888 (D. Ariz. 2004) (citing Beltran and finding irreparable harm shown where Medicaid recipients could be denied medical care as a result of their inability to pay increased co-payment to medical service providers); Edmonds v. Levine, 417 F. Supp. 2d 1323, 1342 (S.D. Fla. 2006) (finding that state Medicaid agency's denial of coverage for off-label use of prescription pain medication would irreparably harm plaintiffs).

In addition, Plaintiffs have presented ample evidence to support their claim that they will suffer immediate and irreparable harm unless the Court issues a preliminary injunction.  Counselors who work with IHSS recipients predict a "humanitarian disaster" and premature deaths.  Baran Decl. ¶ 18; Goldberg Decl. ¶¶ 6-7.  Some individuals who lose their IHSS may neglect to take vital medications or take them improperly.  Others will be unable to leave their house to obtain food, medication and other necessities. Without an IHSS caregiver to transport recipients to doctor's appointments, many will go without essential care.  Some recipients will try to clean their home or cook food and injure themselves as a result.  Other recipients, because of mental illness or lack of

---

[10](...continued)
their other claims under the ADA.

appetite, need assistance in order to eat at all.

Entire families will be destabilized when a child or family member is deprived of IHSS because relatives serving as caregivers will be forced to seek other jobs without a way to care for their loved ones.  See e.g., Hathaway Decl. ¶ 5; Crockett Decl. ¶¶ 19-20; Kaljian Decl. ¶ 18.  Even a temporary interruption in services may "result in damaging setbacks" for the affected individual.  Baran Decl. ¶ 20.  The Executive Director of the IHSS Consortium in San Francisco stated:

> Each one of the IHSS recipients affected by the cuts represents a person with a disability who has been stabilized at home, often through a painstaking process that takes months or even years, to find the right attendant, the right home or apartment, the right combination of services.  All of this will be lost.  And even if the cuts are restored later, it will be virtually impossible to rebuild the safe living situations people have now.

Id.  There is also a serious risk that individuals with mental or cognitive disabilities will become homeless if they lose IHSS services.  Once homeless, mentally ill individuals decline rapidly and could end up anywhere from a psychiatric hospital to jail.

As noted above, if ABX4 4 is implemented, class members will face a severe risk of unnecessary institutionalization.[11]  Institutionalizing individuals who can comfortably survive in their

___

[11]State Defendants argue that Plaintiffs have not shown that any "named plaintiffs" are likely to suffer imminent, irreparable harm.  Opposition at 28.  However, Defendants do not point to any Ninth Circuit law that imposes the requirement that the Court should consider only the risk of institutionalization faced by the named Plaintiffs, and not by other class member declarants.  Moreover, because Defendants have conceded that the instant injunction may apply to the entire class before such a class is certified, the Court can look beyond the named Plaintiffs when analyzing this aspect of the preliminary injunction motion.  Further, even if Defendants' argument is correct, the named Plaintiffs in this case are likely to face the risk of unnecessary institutionalization.

United States District Court
For the Northern District of California

home with the help of IHSS caregivers will "cause Plaintiffs to suffer injury to their mental and physical health, including a shortened life, and even death for some Plaintiffs." Crabtree v. Goetz, 2008 WL 5330506, at *30 (M.D. Tenn.).

The balance of hardships also weighs in Plaintiffs' favor. If the preliminary injunction does not issue, the State Defendants' sole injury will be the financial costs associated with continuing to provide services under the status quo. The Court weighs California's budget crisis in the balance. However, "[a] budget crisis does not excuse ongoing violations of federal law, particularly when there are no adequate remedies available other than an injunction." Independent Living Ctr., 572 F.3d at 659. If the State is of the view that some people are receiving IHSS services for their convenience or improved quality of life rather than need, individualized measures could be adopted to address this circumstance. Further, the Court notes that there is persuasive evidence that the IHSS cuts would actually cost the State tens of millions of additional dollars because in-home care is considerably less expensive than institutional care and IHHS caregivers reduce the need for expensive emergency room visits and hospitalization. Accordingly, the financial loss the State may suffer if ABX4 4 is not implemented does not outweigh the hardship Plaintiffs would suffer absent an injunction.

Lastly, the public interest weighs heavily in favor of granting relief. "It would be tragic, not only from the standpoint of the individuals involved but also from the standpoint of society, were poor, elderly, disabled people to be wrongfully deprived of essential benefits for any period of time." Lopez v.

1  <u>Heckler</u>, 713 F.2d 1432, 1437 (9th Cir. 1983).

2  III. Bond

3      Federal Rule of Civil Procedure 65(c) "invests the district

4  court 'with discretion as to the amount of security required, <u>if</u>

5  <u>any</u>.'"  <u>Jorgensen v. Cassiday</u>, 320 F.3d 906, 919 (9th Cir. 2003)

6  (emphasis in original; quoting <u>Barahona-Gomez v. Reno</u>, 167 F.3d

7  1228, 1237 (9th Cir. 1999)).  A district court has the discretion

8  to dispense with the security requirement where giving security

9  would effectively deny access to judicial review.  <u>See Save Our</u>

10 <u>Sonoran, Inc. v. Flowers</u>, 408 F.3d 1113, 1126 (9th Cir. 2005)

11 (citation omitted).  Similarly, a district court may waive the bond

12 requirement where the plaintiffs are indigent.  <u>See Walker v.</u>

13 <u>Pierce</u>, 665 F. Supp. 831, 844 (N.D. Cal. 1987).  The Court waives

14 the bond requirement for Plaintiffs because they are indigent and

15 to ensure their ability to access the courts on behalf of

16 themselves and other class members.

17                        CONCLUSION

18      For the foregoing reasons, the Court grants Plaintiffs' motion

19 for a preliminary injunction (Docket No. 16).  Defendants and their

20 successors, agents, officers, servants, employees, attorneys and

21 representatives and all persons acting in concert or participating

22 with them are enjoined from implementing the provisions of ABX4 4

23 that amended Sections 12309(e) and 12309.2 of the California

24 Welfare and Institutions Code to terminate from eligibility for

25 IHSS services those recipients with Functional Index Scores of less

26 than 2.0 and to eliminate domestic and related services for

27 recipients with functional ranks of less than 4 for those services.

28      The Court further orders that, to the extent that Defendants

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

have already taken actions to eliminate eligibility for IHSS services for individuals with an FI Score under 2, or to eliminate eligibility for domestic and related services for individuals with functional ranks under 4, Defendants shall take all steps and commit all resources necessary to ensure that no otherwise eligible individual is denied eligibility for, or terminated from, IHSS, solely on the basis of an FI Score under 2.0, and that no otherwise eligible individual is denied eligibility for, or terminated from, receipt of domestic and related IHSS services, solely on the basis of a functional rank under 4. Defendants shall further ensure that there is no delay in paying IHSS providers for services rendered to individuals whom Defendants had planned to terminate or reduce IHSS eligibility on the basis of an FI score under 2.0 or a functional rank under 4. Defendants shall determine the method of implementing the preliminary injunction that will be the least expensive in the aggregate to the county and state taxpayers. Defendants may require the counties to re-enter manually the information about individual recipients whose IHSS services were scheduled to be terminated or reduced because their FI Scores were below 2.0 or their functional ranks for a particular domestic or related service were below 4 only if that is less expensive than doing it themselves. The State must reimburse the counties for their expenses. The State may instead restore the system back-up and re-enter the changes made in the interim.

     To ensure that all relevant parties are aware of the Court's injunction, Defendants shall further rescind any directions or notices issued to any person or entity for the termination or reduction of IHSS benefits on the basis of an FI Score under 2 or

United States District Court
For the Northern District of California

1   functional ranks under 4; and shall notify all persons and entities

2   that have received such directions or notices that such IHSS

3   benefits will not be terminated or reduced.  Defendants shall mail

4   a notice to all IHSS recipients informing them, in language agreed

5   upon by the parties, that the previously announced terminations or

6   reductions in IHSS service will not go into effect.  Defendants

7   must mail this notice by Tuesday, October 27.

8       Defendants shall post a copy of this preliminary injunction

9   with an explanation of its effect on IHSS services conspicuously on

10  its website by the close of business on Monday, October 26, 2009.

11  Defendants shall serve and file a declaration of compliance by

12  Thursday, October 29, 2009.

13      The Court denies Plaintiffs' motion for class certification

14  without prejudice to refiling (Docket No. 20) and denies

15  Defendants' motion for reconsideration of the temporary restraining

16  order (Docket No. 169).  The Court denies Defendants' motion, made

17  orally at the hearing, for a stay pending appeal.

18      IT IS SO ORDERED.

19  Dated: 10/23/09

    _____
    CLAUDIA WILKEN
20  United States District Judge